IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Thomas James Duggan, | ) | C/A No. 3:08-649-MJP-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Sisters of Charity Providence Hospitals, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This employment discrimination matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC on the defendant's motion for summary judgment (Docket Entry 31.) The plaintiff, Thomas James Duggan ("Duggan"), filed this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), asserting that the defendant, Sisters of Charity Providence Hospitals ("Providence"), unlawfully discriminated against him on the basis of gender when it terminated his employment.

The defendant filed a motion for summary judgment. (Docket Entry 31.) Following an extension of time, the plaintiff filed a response. (Docket Entry 37.) The defendant filed a reply. (Docket Entry 40.) The motion is now ready for a Report and Recommendation.

**BACKGROUND**

Viewed in the light most favorable to Duggan, the following facts are pertinent to the resolution of Providence's motion. Duggan, who is male, is a Certified Registered Nurse Anesthetist ("CRNA"). From 1992 until 2007, Duggan worked at Providence, first as a contract CRNA through a private anesthesia group, then as a Providence employee. (Duggan Aff. ¶¶ 4-6, Docket Entry 37-2

at 3.)  CRNAs are an elite group of nurses who are specially trained, well respected, and highly paid. (Id. ¶ 2, Docket Entry 37-2 at 2.)  During Duggan's fifteen years with Providence, he performed his job well and was never formally counseled, written up, or otherwise disciplined.  (Id. ¶¶ 7-8, Docket Entry 37-2 at 3.)  He received positive performance evaluations while employed at Providence, although many of his annual evaluations noted that Duggan needed to improve his interpersonal skills.  (Docket Entry 31-4 at 6, 27-28, 44, 49.)

Duggan asserts that at the time of his termination in 2007, he was the only male CRNA employed at Providence.  However, he further asserts that he and four female CRNAs—Kelly Hersey, Mindy Gibson, Kim Mace, and Diane Jenkins—worked under Chief CRNA Rick Thomas, who, apparently, is also male.  The evidence shows that the profession of CRNA is a stressful one, as these nurses have life-or-death responsibilities in the operating room ("O.R.") setting. Additionally, some friction apparently existed between the CRNAs and other O.R. staff regarding scheduling, room changes, and other O.R. issues.  It was not uncommon for the CRNAs, including the females, to engage in profanity or vulgar language and to direct angry outbursts at other Providence staff, particularly the O.R. nurses; Thomas, the Chief CRNA; and even, on at least one occasion, a physician. (Duggan Aff. ¶¶ 13-19, Docket Entry 37-2 at 5-6.)  There is no evidence that any CRNA was ever disciplined or terminated due to such behavior until Duggan.

On January 19, 2007, Duggan became upset when, after he had arrived early and set up for surgery in his scheduled operating room, the O.R. nurse in charge, Gayle Byers, informed him at the last minute that she was switching him to another O.R.  He responded irritably to Byers and stated, "[T]his is bullsh*t."  He then rushed to set up the new room.  After that, he returned to the "holding area," which, Providence asserts, is a patient care area. (Duggan Aff. ¶ 27, Docket Entry 37-2 at 7-8;

Ross Aff. ¶ 3, Docket Entry 31-10 at 8.) There he spoke with the anesthesiologist in charge, Dr. Blackmon, and asked if he could take a break to cool off. (Id.; Blackmon Dep. at 11, Docket Entry 37-3 at 12.) The evidence diverges as to whether Duggan used "the F word" in the holding area.[1] (Compare Duggan Aff. ¶¶ 28, 30, Docket Entry 37-2 at 8; Witness Statement, Docket Entry 37-6 at 8, 11; with Windham Aff. ¶ 4, Docket Entry 31-10 at 12-14; Witness Statement, Docket Entry 37-6 at 15). Duggan continued to express his frustration until the surgeon performing the scheduled procedure, Dr. Samuels, asked him to stop. (Duggan Dep., Docket Entry 31-3 at 14; Witness Statements, Docket Entry 31-9 at 2, 4.) Various hospital staff witnessed these events. (See, e.g., Windham Aff., Docket Entry 31-10 at 12-14; Brice Statement, Docket Entry 31-9 at 4; Blake Statement, Docket Entry 31-9 at 6; Blackmon Dep., Docket Entry 37-3; Gonzales, Docket Entry 37-6 at 13.)

Jean Windham, the Director of the O.R., witnessed Duggan's behavior. (Windham Aff. ¶ 4, Docket Entry 31-10 at 12.) She reported Duggan's conduct to her supervisor, Martha Stratton, Vice President of Surgical Services. (Id. ¶ 5, Docket Entry 31-10 at 13.) Stratton in turn reported the incident to her supervisor, Joan Ross, Chief Nursing Officer of Providence. (Ross Aff. ¶¶ 2-3, Docket Entry 31-10 at 8.) Ross has terminated at least four Providence employees, both male and female, for using profanity or loud or inappropriate language on hospital grounds in violation of hospital policy. (Id. ¶ 4, Docket Entry 31-10 at 9.) At least one of these employees was a nurse, although not a CRNA. (See Ross Aff. ¶ 4, Docket Entry 31-10 at 9.)

Based on Windham's account of the January 17 incident, and after consulting with Stratton and Rick Grooms, the Vice President of Human Resources, Ross determined that Duggan's

---

[1]Duggan does not appear to dispute that he said "bullsh*t" in the holding area.



employment should be terminated. (Ross Aff. ¶ 3, Docket Entry 31-10 at 8-9.) Thomas was then instructed to discharge Duggan as a result of the conduct reported by Windham. Accordingly, approximately three hours after the incident occurred, Duggan was fired.

Duggan filed a grievance to challenge his termination. (Docket Entry 37-6 at 27.) The administration of the hospital upheld Ross's decision. (Docket Entry 37-6 at 29, 37.)

## DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no *genuine* issue of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine

whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. The Reeves Court stated:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Reeves, 530 U.S. at 148. The Court of Appeals for the Fourth Circuit has stated that the Reeves Court instructs more broadly regarding the factors "on which the appropriateness of a judgment as a matter of law will depend in any case and will include 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employers' case and that properly may be considered on a motion for judgment as a matter of law.'" Dennis, 290 F.3d at 649 (quoting Reeves, 530 U.S. at 148-49)).

**B.      Burden Shifting in Employment Cases**

The parties agree that the McDonnell Douglas burden-shifting framework should be applied in this matter. A plaintiff may demonstrate discrimination or retaliation through direct or circumstantial evidence. When direct evidence is lacking, as in this case, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a prima facie case of discrimination or retaliation, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Holland v. Washington

Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). The defendant's burden "is a burden of production, not persuasion." Id. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "'the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*.'" Id. (quoting Reeves, 530 U.S. at 142).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "'not its true reason[], but [was] a pretext for discrimination.'" Id. (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004)). Accordingly, the plaintiff's burden of demonstrating pretext "'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005). To meet this burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Holland, 487 F.3d at 214 (quoting Burdine, 450 U.S. at 256).

"'[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated.'" Id. at 215 (quoting Reeves, 530 U.S. at 148). However, if the plaintiff creates only "a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "'the probative value of the proof

Page 6 of 14

PJG

that the employer's explanation is false.'" Id. (quoting Reeves, 530 U.S. at 149). To carry his "merged" burden to establish pretext and intentional discrimination, a plaintiff must prove "'*both that the reason was false, and* that discrimination was the real reason for the challenged conduct.'" Holland, 487 F.3d at 218 (quoting Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997)) (emphasis added) (discussing plaintiff's retaliation claim); see also Burdine, 450 U.S. at 256 (discussing merging of plaintiff's burdens).

**C.     Duggan's Claims**

   **1.     Prima Facie Case**

The parties agree that to establish a prima facie case of discrimination based on disparate treatment, a plaintiff must show: (1) that he engaged in prohibited conduct *similar* to that of a person of another race, color, sex, religion, or national origin; and (2) that disciplinary measures enforced against him were more severe than those enforced against the other person. Lightner v. City of Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008).

Duggan also asserts a claim of "discriminatory discharge." To establish a prima facie case of Title VII gender discrimination with regard to termination of employment, Duggan must show (1) that he is a member of a protected class; (2) that he was qualified for the job and that his job performance was satisfactory; (3) that he was discharged; and (4) that other employees outside the protected class were retained under *similar* circumstances.[2] Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); see also King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003).

---

[2]Providence does not dispute that Duggan meets the first three elements of this *prima facie* case. (Def.'s Reply, Docket Entry 40 at 7.)

Page 7 of 14

PJG

The crux of Duggan's case is his claim of disparate treatment, as he relies on that evidence to establish both theories of his case. (See generally Pl.'s Mem. Opp'n Summ. J. at 23-25, Docket Entry 37 at 23-25.) To prevail on either theory, Duggan must show that female employees who were similarly situated to him were treated more favorably. See Lightner, 545 F.3d at 264-65 (requiring a plaintiff to show that he engaged in prohibited conduct *similar* to that of a person of another race, color, sex, religion, or national origin); Hughes, 48 F.3d at 1383 (requiring a plaintiff to demonstrate that other employees outside the protected class were retained under *similar* circumstances). To be similarly situated and thus permit a valid comparison, the female employees must have dealt with the same supervisor, been subject to the same standards,[3] and have engaged in the same conduct without mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (Title VII & ADEA) (defining "similarly situated").[4]

Duggan does not dispute that his conduct was inappropriate and subject to some sort of sanction short of termination; he simply contends that termination was excessive in light of the fact that female CRNAs were not punished for what he characterizes as "similar conduct." Although Duggan claims that his conduct is comparable or even less serious than that of the female CRNAs,

---

[3]The parties do not appear to dispute that all Providence employees were subject to Providence's policies regarding profanity and abusive language to co-workers or supervisors. (Progressive Discipline & Dismissal Policy, Docket Entry 31-4 at 75.)

[4]The Fourth Circuit has not issued a published case on this point; however, the following unpublished cases have cited with approval the Mitchell decision: Forrest v. Transit Mgmt. of Charlotte, Inc., 245 Fed. Appx. 255 (4th Cir. 2007) (unpublished) ("If different decision-makers are involved, employees are generally not similarly situated."); Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494, *2 (4th Cir.1998) (Table); Edward v. Newport News Shipbuilding & Dry Dock Co., 166 F.3d 1208, 1998 WL 841567 at *3 (4th Cir. 1998) (Table).

*PJG*

the court observes that, even accepting all of Duggan's assertions regarding their conduct as true, there is absolutely no evidence that any of the female CRNAs used profanity or abusive language where patients or their families could hear it. (See generally Duggan Aff. ¶¶ 13-19, Docket Entry 37-2 at 4-6.) This fact alone constitutes a differentiating circumstance precluding their use as valid comparators. Mitchell, 964 F.2d at 583. Nonetheless, even assuming that the female CRNAs' alleged misconduct was comparable to Duggan's, his claim of gender discrimination fails, as the female CRNAs are not valid comparators for another significant reason: they did not share the same decision maker.

The parties have presented two different sets of potential comparators. As an initial matter, to resolve this disparate treatment case, the court must first determine which set of employees, if either, should be used for comparison. The set of employees relied upon by Duggan to show disparate treatment ("Duggan's Comparators") all reported to the same *immediate* supervisor, Thomas. (Pl.'s Mem. Opp'n Summ. J. at 4-7, 24-25, Docket Entry 37 at 4-7, 24-25.) The set relied upon by Providence to show consistency ("Providence's Comparators"), although they did not all report to the same immediate supervisor or hold the same job, apparently were all under the umbrella of Ross's supervision. (Def.'s Mem. Supp. Summ. J. at 7, 9-11, Docket 31-2 at 7, 9-11.)

Case law shows that it is not necessarily the immediate supervisor that is important for determining valid comparators, but rather the *decision maker*. See Holtz v. Jefferson Smurfit Corp., 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006) ("[T]he employee must generally show the same *decisionmaker* made the disparate employment decisions.") (emphasis added), aff'd, 242 Fed. Appx. 75 (4th Cir. 2007) (per curiam) (unpublished); see also Herron v. Virginia Commonwealth Univ., 366 F. Supp. 2d 355, 368 n.16 (E.D. Va. 2004) (observing that the fact that an agent of the defendant

"who took different action under allegedly similar circumstances involving other students who were outside the protected class was a *different individual* than the decisionmaker in Plaintiff's case, is a fatal distinction") (emphasis added); see also Forrest, 245 Fed. Appx. 255 ("If different decision-makers are involved, employees are generally not similarly situated."). Accordingly, for purposes of a disparate treatment analysis under the facts presented, the relevant supervisor is Ross.

Here, Duggan cannot show that Duggan's Comparators' conduct was ever reported to Ross. Ross avers that she was never asked to discipline any employees other than Duggan and Providence's Comparators for similar misconduct. By contrast, Duggan's conduct was reported to Ross by Windham, through Stratton. (Ross Aff. ¶ 3, Docket Entry 31-10 at 8; Windham Aff. ¶ 5, Docket Entry 31-10 at 13.) Essentially, then, Duggan seeks to establish a claim of disparate treatment by comparing himself to a set of individuals who engaged in similar misconduct but did not get caught by the relevant decision maker. The fact that Windham apparently viewed Duggan's conduct as egregious enough to go over Thomas's head to Stratton and Ross may be unfortunate for Duggan, but it does not establish gender discrimination.[5]

Viewed in the light most favorable to Duggan, the evidence shows only that Thomas indiscriminately tolerated profanity and outbursts by employees under his supervision, and that Ross,

---

[5] Much of the parties' memoranda address the factual discrepancies among the witnesses about the severity of Duggan's conduct on January 17; however, factual discrepancies about the underlying conduct are irrelevant because it is the perception of the decision maker that matters. See Holland, 487 F.3d at 217-18 (concluding that no reasonable juror could conclude the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that the threats were made" and noting that "'[i]t is the perception of the decisionmaker which is relevant.'") (quoting Tinsley v. First Union Nat'l Bank, 155 F.3d 435 (4th Cir. 1998)).

in an equally nondiscriminatory manner, did *not* tolerate that type of conduct by employees under *her* supervision. Accordingly, Duggan's claim of gender discrimination must fail.

    **2.    Pretext**

For the same reason, Duggan cannot show that Providence's reason for terminating him while retaining the female CRNAs was pretextual. Relying on Moore v. City of Charlotte, 754 F.2d 1100 (4th Cir. 1985), Duggan contends that to articulate a legitimate non-discriminatory reason for the difference in treatment, Providence may not simply rely on the offense for which it ostensibly terminated Duggan, but rather must explain why the female CRNAs were treated differently or more favorably than Duggan. See Moore, 754 F.2d at 1106-07. He contends that Providence has not provided an explanation "why female CRNAs could, on hospital property, curse each other, their supervisor Rick Thomas, Dr. Blackmon, O.R. Charge Nurse Gayle Byers, and O.R. Director Jean Windham, yet not be terminated." (Pl.'s Mem. Opp'n Summ. J. at 26, Docket Entry 37 at 26.) As discussed above, however, Providence has provided such a reason—the decision maker in Duggan's case, Joan Ross, was not aware of such behavior. Duggan has presented absolutely no evidence that

*this reason* is false or unworthy of credence.⁶ Although he makes vague contentions that "supervisors" or "management" was aware of the female CRNAs' conduct, the evidence he presents to support that assertion shows that the only individual with supervisory authority over the CRNAs who had such knowledge was Thomas.⁷ (See Duggan Aff. ¶¶ 13-19, Docket Entry 37-2 at 4-6; Thomas Dep., Docket Entry 37-4 at 25-26.) Nothing suggests that Ross, who was apparently in charge of all nurses at Providence, was aware of such conduct. The fact that *Thomas* may have overlooked profanity from the CRNAs does not show that *Ross* engaged in unlawful discrimination when she did not tolerate Duggan's.

Whether one considers Duggan's supervisor to be Ross or Thomas, there is no dispute that Ross made the decision to fire him. (Pl.'s Mem. Opp'n Summ. J. at 21, Docket Entry 37 at 21; Duggan Aff. ¶ 31, Docket Entry 37-2 at 8; Groom Dep. at 22, Docket Entry 31-7 at 5.) Further, there

---

⁶Rather, Duggan focuses on the explanation that he was terminated for his misconduct on January 17, 2007, asserting he can show that this reason was pretextual given the rush to judgment to terminate him; the failure to interview witnesses or Duggan himself; the alleged failure to follow hospital policy; and the failure to consult with Duggan's supervisor, Thomas, before deciding to terminate him. While this evidence, if true, could establish unfairness in the process, it is not probative of discriminatory intent. See Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir.1995) ("The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."); Babbar v. Ebadi, 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998) (stating that evidence that the employer deviated from procedures during the adverse employment action "goes only to process and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for discrimination") (internal quotations omitted); Jacobs v. Delta Air Lines, Inc., 1998 WL 514620 at *3 (10th Cir. Aug.13, 1998) (stating that plaintiff's assertion of poor investigation "challenges the process applied rather than [the employer's] purpose or motivation" and cannot support an inference of pretext).

⁷While Duggan claims that Byers, Windham, and Dr. Blackmon also witnessed profanity and abusive language by female CRNAs, nothing in the record suggests that these individuals supervised the CRNAs. Significantly, the fact that Windham, Director of the O.R., reported Duggan's outburst to her own supervisor, Stratton, suggests that Windham had no supervisory authority over the CRNAs.



can be no dispute on this record that Ross was consistent in her treatment of all employees—whether male or female—about whom she received information that they had engaged in abusive or profane language with co-workers. (Ross Aff. ¶ 4, Docket Entry 31-10 at 9.) Consequently, although Duggan may have been treated unfairly, he cannot show unlawful gender discrimination.[8] Unfairness is not enough. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (stating that "when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination") (internal quotation and citation omitted).

**RECOMMENDATION**

Accordingly, the court recommends that the defendant's motion for summary judgment (Docket Entry 31) be granted.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

August 7, 2009
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

---

[8]Although Duggan states in his affidavit that his former supervisor had told him that Windham and Ross were targeting him for termination because he was a successful male CRNA, the court notes that Duggan has produced no admissible evidence to that effect, and further, he makes no mention of this in his memorandum opposing summary judgment. (Duggan Aff. ¶ 32, Docket Entry 37-2 at 9.)

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the district judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district judge need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985).